KANSAS MUNICIPAL GAS
AGENCY, Plaintiff,

v.

VESTA ENERGY COMPANY,
INC., Defendant.

VESTA ENERGY COMPANY, INC.,
Third–Party Plaintiff,

v.

GASTRAK CORPORATION,
Third–Party Defendant.

No. 92–2350–JWL.

United States District Court,
D. Kansas.

Dec. 3, 1993.

Robert L. Bezek, Jr., James G. Flaherty, Dee Anne Henrichs, Anderson, Byrd, Richeson & Flaherty, Ottawa, KS, for plaintiff.

Kirk T. May, Robert M. Thompson, Rouse, Hendricks, German, May & Shank, Kansas City, MO, for defendants.

Lee M. Smithyman, David J. Roberts, Smithyman & Zakoura, Chtd., Overland Park, KS, for Gastrak Corp.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

#### I. Introduction

This case involves breach of contract and related fraud claims arising out of a contract for the sale of natural gas between plaintiff Kansas Municipal Gas Agency ("KMGA") and defendant Vesta Energy Company, Inc. ("Vesta"). Vesta has also asserted claims against third-party defendant GasTrak Corporation ("GasTrak"). The matter is currently before the court on the following motions: (1) motion by third-party defendant GasTrak for summary judgment (Doc. # 45); (2) motion by defendant Vesta for summary judgment against KMGA (Doc. # 47); and (3) motion by plaintiff KMGA for summary judgment (Doc. # 53). A hearing was held on these motions on November 22, 1993, and they are ripe for decision.[1]

For the reasons set forth below, the parties' motions are granted in part and denied in part. Summary judgment is granted to KMGA on Vesta's fraud claim against KMGA, to GasTrak on Vesta's breach of contract and unjust enrichment claims against GasTrak, and to Vesta on KMGA's fraud claim against Vesta. Summary judgment is denied as to all other claims.[2]

#### II. Factual Background

The following facts are uncontroverted. KMGA is a Kansas interlocal municipal agency formed by a group of Kansas municipalities pursuant to K.S.A. § 12–2901, *et seq.* One of KMGA's functions is to acquire a

---

1. The hearing took place at the final pretrial conference, at which all parties waived their jury demands. The case is set to proceed to trial to the court on January 4, 1994.

2. As set out below, however, this order limits the scope of KMGA's breach of contract claim to the good faith and fair dealing issue.

natural gas supply to be used by the municipalities for local distribution and fuel for electric generation. KMGA retained GasTrak as its executive agent to acquire a natural gas supply for the agency and to manage the transportation and accounting matters relating to that gas supply. GasTrak provides professional expertise and services in acquiring gas supplies for customers and also provides administrative and management services relating to transportation and accounting matters after the customer has acquired a gas supply.

On January 31, 1992, GasTrak mailed a request for proposal ("RFP") out to various gas suppliers seeking offers to supply gas to KMGA. The RFP provided KMGA's estimated average daily quantity requirements, monthly quantity requirements and peak day requirements by pipeline. The three pipelines from which KMGA required gas were the Arkla pipeline, the Williams Natural Gas Company ("WNG") pipeline and the Kansas Power and Light Company ("KPL") pipeline. The RFP provided various pricing provisions that would be acceptable and also requested that the gas supplier provide a firm supply of gas. A specimen contract was provided with the RFP and bidders were instructed to designate any exceptions to the proposed contract terms.

On February 14, 1992, in response to the RFP, Vesta provided GasTrak with a proposal to serve KMGA's gas requirements beginning May, 1992. Vesta proposed to provide one hundred percent of KMGA's gas requirements for the Arkla, WNG and KPL pipelines. Vesta provided a flat price, winter/summer price and a futures price on each of the three pipelines for a term of one year beginning May 1, 1992 and ending April 30, 1993.

Following Vesta's response to the RFP, there was a meeting between officials of GasTrak, KMGA, Vesta and another bidder on April 1, 1992. At that meeting it was made clear that the contract for gas supply would be awarded to Vesta. Following the April 1 meeting, negotiations between GasTrak and Vesta commenced which resulted in the execution of three letter agreements whereby Vesta agreed to begin supplying gas

to KMGA at agreed upon prices from the three pipelines (the "letter agreements"). The letter agreements were for one year terms, contained set price terms for summer and winter gas, and specified the delivery point for the gas (which corresponded to the respective pipelines). Additionally, each of the letter agreements contained the following language:

This Letter Agreement shall remain valid until the execution of a mutually agreeable contract. Should Buyer and Seller fail to reach a mutually agreeable contract, this Letter Agreement shall become null and void.

Vesta warrants these volumes at the agreed to price except under generally accepted conditions of Force Majeure.

Following the execution of the letter agreements, the parties entered into negotiations on a finalized written contract. On April 9, 1992, Vesta provided KMGA/GasTrak with a proposed contract based on the specimen contract contained in the original RFP with revisions. Over the next several months, the parties exchanged draft contracts and conducted telephone negotiations in an attempt to arrive at a mutually agreeable contract. Several issues remained unresolved, including Vesta's demand for assurances that supplied gas was going only to KMGA member cities, pricing language for peak volumes during times of curtailment, creditworthiness provisions, and force majeure language.

On July 20, 1992, Vesta sent a memo to KMGA/GasTrak outlining their concerns. On August 4, 1992, the parties had a meeting in an attempt to work out their differences. KMGA contends that virtually all remaining points of contention were resolved at this meeting and all that remained was to prepare a formal contract memorializing the parties' agreement. On August 17, 1992, KMGA/GasTrak prepared yet another draft contract and sent it to Vesta. However, on September 8, 1992, Vesta sent a letter to KMGA declaring the letter agreements null and void due to the parties' failure to reach agreement on a mutually acceptable contract.

Following Vesta's cancellation of the letter agreements, KMGA was forced to purchase gas from another supplier at a price higher than that provided for in the letter agreements.

### III. Summary Judgment Standards

A motion for summary judgment gives a judge an initial opportunity to assess the need for a trial without weighing the evidence or determining credibility. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512.

The party who files a motion for summary judgment has the initial burden of demonstrating the absence of a genuine issue of material facts concerning its claims. This burden may be met by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial. *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. The nonmoving party may not simply rest on its pleadings in the case but has the affirmative duty to come forward with facts to establish that a genuine issue exists necessitating a trial in the case. *Id.* Thus, the mere existence of some alleged factual dispute between the parties will not defeat an other-

wise properly supported motion for summary judgment. *Id.* The court must consider the record in the light most favorable to the party opposing the motion. *Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir.1984), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985). More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555.

### IV. Discussion

#### A. KMGA's Breach of Contract Claim

KMGA contends that it is entitled to summary judgment on its breach of contract claim against Vesta. KMGA first argues that Vesta's unilateral termination of the letter agreements was improper. KMGA contends that it was the intent of the parties, and is made clear from the language of the letter agreements, that the letter agreements would remain in effect unless the parties mutually agreed that they could not reach an agreement on the open terms. In other words, KMGA contends that the parties had to mutually "agree that they could not reach agreement" on the terms of a contract, and thus Vesta's unilateral cancellation of the letter agreements was a breach of contract.

KMGA lists no authority that would support its proposed interpretation of the letter agreement language, and the court finds that no such interpretation is warranted from the plain meaning of the words. The letter agreements provide that "should Buyer and Seller fail to reach a mutually agreeable contract" the letter agreement becomes null and void. There is no dispute that the parties failed to reach a mutually agreeable contract. Due to this failure, the letter agreements became null and void under the plain language contained in them.[3]

The real question at issue regarding KMGA's breach of contract claim is whether the parties' failure to reach a mutually agreeable "final written contract" was due to Vesta

---

3. As a result of this legal determination by the court, KMGA's issues of fact and law based on this theory will be deleted by the court from the pretrial order.

breaching its obligation of good faith and fair dealing under the letter agreements. The parties apparently agree that the letter agreements are governed by the Kansas Uniform Commercial Code, K.S.A. § 84–1–101, et seq. Natural gas is covered by the definition of "goods" contained in K.S.A. § 84–2–105. There can be no doubt that, at the time of the execution of the letter agreements, both parties fully intended that performance included attempting to arrive at a mutually agreeable final written contract governing the gas purchase. The parties were therefore obligated under K.S.A. § 84–1–203 to conduct themselves in good faith in the performance of the letter agreements by their negotiation and finalization of the final written contract. Because the parties fit the UCC definition of merchants contained in K.S.A. § 84–2–104(1),[4] the duty of good faith applicable here is defined in K.S.A. § 84–2–103(1)(b).[5] On this much the parties also agree.

 KMGA contends it is entitled to summary judgment because the facts clearly show that Vesta breached its duty of good faith and fair dealing in the negotiation of the final written contract in that Vesta's stated reasons for declaring the letter agreements null and void were merely pretextual. KMGA contends that Vesta's true motivation was a desire to get out of the deal due to the fact that natural gas prices were rising and Vesta was losing money on its bargain.

In support of its contention, KMGA has submitted a lengthy recital of what it contends are uncontroverted facts, together with six volumes of documents and transcribed deposition testimony in support. In a nutshell, KMGA contends the facts show that following Vesta's reply to the RFP and the execution of the letter agreements, there were only three terms left open subject to further negotiations, those being peak day curtailment, warranty and force majeure provisions. KMGA then contends that through-

out the negotiation process Vesta proceeded to add new terms to the contract, renege on agreements that had already been agreed to, and demand provisions that conflicted with terms upon which agreement had already been reached. KMGA then contends that Vesta relied on these disagreements, which in fact had been created by Vesta and were merely pretextual, to declare the letter agreements null and void. KMGA contends the uncontroverted facts show that Vesta's sole motivation to declare the letter agreements void was that the price of natural gas had risen sharply since the letter agreements had been executed, and Vesta desired to terminate them because it was losing money.

In response, Vesta presents facts which tend to show that Vesta was in fact negotiating the written agreement in good faith and that there were indeed significant terms of the contract that remained unresolved, therefore causing Vesta to declare the letter agreements null and void pursuant to the language contained therein. Vesta vehemently denies that its decision to terminate the letter agreements was motivated in any way by the rising price of natural gas.

As to KMGA's breach of contract claim, the court finds it is faced with disputed material facts which preclude summary judgment. If KMGA's version of the facts were to be believed, Vesta breached its duty of good faith and fair dealing by purposely preventing the execution of a mutually agreeable contract on pretextual grounds for the purpose of voiding the letter agreements due to the fact that the price of natural gas had risen and the letter agreements now represented a bad business deal for Vesta. However, Vesta has presented facts which, if believed by the trier of fact, would indicate that Vesta negotiated for a final written contract in good faith and that it voided the letter agreements only because the parties were unable to reach agreement on impor-

4. K.S.A. § 84–2–104(1) defines a merchant as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other inter-

mediary who by his occupation holds himself out as having such knowledge or skill."

5. K.S.A. § 84–2–103(1)(b) provides that "good faith in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."

tant terms of the written agreement. The remaining issues of material fact make summary judgment on the issue of Vesta's compliance with its duty of good faith and fair dealing inappropriate at this time.

### B. KMGA's Fraud Claim

 In its fraud claim, KMGA alleges that Vesta misrepresented the nature of its supply contracts for providing natural gas, and that KMGA relied on the misrepresentation to its detriment. KMGA alleges that its original RFP stated that KMGA required a "firm supply" of natural gas and not an interruptable supply or a supply that was subject to recall. KMGA contends that "firm supply" has a specific meaning within the natural gas industry and is defined as a type of supply which is available to the end user 365 days a year. KMGA contends that at the April 1, 1992 meeting Jack Meyer, on behalf of Vesta, indicated that Vesta would supply one hundred percent of KMGA's needs and assured that the supply would be "firm supply." KMGA contends that it relied on this statement by Mr. Meyer when it awarded the supply contract to Vesta. KMGA contends that although Vesta represented during negotiations that it had a "firm supply" of gas, in fact, after reviewing Vesta's gas supply contracts in connection with this litigation, KMGA discovered that Vesta's supply contracts were actually "best efforts" contracts. KMGA asserts that Vesta's representation that it would supply a "firm supply" of gas was fraudulent, and KMGA is therefore entitled to recover punitive damages as a result of Vesta's fraud.[6]

 The court finds KMGA's fraud claim deficient because plaintiff has failed to show that Vesta's alleged fraud resulted in any additional injury beyond that which KMGA would recover on its breach of contract claim. Under Kansas law, punitive

damages in breach of contract actions are recognized only when some independent tort or wrong results in injury additional to the injury from the breach of contract which justifies the assessment of punitive damages. *Guarantee Abstract & Title Co., Inc. v. Interstate Fire & Cas. Co., Inc.,* 232 Kan. 76, 78, 652 P.2d 665 (1982). In other words, punitive damages will only be allowed in contract actions when (1) there is some independent tort amounting to fraud or wanton conduct, and (2) the independent tort results in additional injury. *Id. See also Osgood v. State Farm Mut. Auto Ins. Co.,* 848 F.2d 141, 144 (10th Cir.1988).

Throughout this litigation, the only damages KMGA had alleged from Vesta's conduct was KMGA's cost of cover when it had to acquire another gas supplier following Vesta's termination of the letter agreements.[7] However, in its response to Vesta's summary judgment motion on its fraud claim, in which Vesta raised the additional injury argument, KMGA for the first time asserted that its actual damages relating to its fraud claim was the fact that KMGA paid a higher price for the gas actually supplied by Vesta, due to its belief that the gas was from a "firm supply," than it would have paid had KMGA been aware that the gas was being supplied to Vesta under best efforts contracts.

 The court finds that KMGA should be precluded from asserting this damage theory due to its failure to assert it in a timely manner. KMGA did not assert this damage theory until its response to Vesta's summary judgment motion, which it filed on November 5, 1993. A party cannot wait until a summary judgment motion is filed against a theory advanced by it and, realizing the lack of merit in its position, suddenly shift to a wholly new and different one, particularly where, as here, that theory is the plaintiff's

---

6. The elements of a fraud claim in Kansas are: (1) the making of a false statement; (2) knowledge that the statement was false when made; (3) the statement was made with the intent to induce action; (4) the plaintiff justifiably relied on the statement; and (5) plaintiff's actions in reliance on the statement resulted in injury or damages. *See Metal Trading Services of Colorado, Inc. v. Trans-World Services, Inc.,* 781 F.Supp. 1539 (D.Kan.1991).

7. On September 7, 1993, KMGA provided Vesta's counsel with a document entitled "Schedule of KMGA's Damages—Difference Between Replacement Gas Price and Contract Price." That schedule sets forth KMGA's damages as the purported cost to cover for the period from September, 1992 through April, 1993.

very own contention as to how it was allegedly damaged. Furthermore, the court finds such a damage theory is not supported by the factual basis of KMGA's fraud claim. It is clear from the evidence before the court that the basis for that claim is that had KMGA been aware that Vesta's suppliers were not supplying Vesta with gas under "firm supply" contracts, KMGA would not have awarded Vesta with the gas supply contract in the first place. KMGA has reiterated the necessity of a "firm supply" of gas, and has presented no evidence that it would have entered into a contract with a best efforts supplier at a lower price. KMGA cannot proceed on a premise that KMGA paid a higher price for the natural gas supplied by Vesta than it would have paid had it known the true nature of Vesta's supply contracts in the absence of any evidence to support that theory, especially, when in fact the evidence presented by KMGA indicates that it would not have entered into an agreement with Vesta in the first place had KMGA known a portion of the gas was supplied to Vesta on a best efforts basis.

KMGA received a constant supply of gas for the period the letter agreements were in effect. The only damage KMGA has shown that it arguably suffered was its cost of cover after Vesta's termination of the letter agreements (assuming Vesta's termination was improper). These costs of cover damages are consistent with what KMGA has alleged throughout this litigation. Because KMGA has failed to show any additional injury as required by Kansas law, summary judgment as to KMGA's fraud claim will be granted.

## C. Vesta's Fraud Counterclaim

Vesta has brought a counterclaim for fraud against KMGA in this action. Vesta contends that during the negotiations leading up to the letter agreements, John Vannatta, a GasTrak employee acting as KMGA's agent, fraudulently misrepresented to Vesta that KMGA had a deal with another supplier at a lower price when in fact no such deal existed. Vesta claims that it relied on Mr. Vannatta's fraudulent misrepresentation by lowering its price, which it would not have done had Vesta indeed been aware that no such other deal existed.

In its motion for summary judgment, KMGA contends that it is entitled to summary judgment on Vesta's fraud counterclaim due to Vesta's failure to comply with the notice requirements of K.S.A. 12–105b. K.S.A. 12–105b provides:

> Any person having a claim against a municipality which could give rise to an action brought under the Kansas Tort Claims Act shall file a written notice as provided in this subsection before commencing such action.... Once notice of the claim is filed, no action shall be commenced until after the claimant has received a notice from the municipality that it has denied the claim or until 120 days has passed following the filing of the notice of claim, whichever occurs first.... No person may initiate an action against a municipality unless the claim has been denied in whole or in part....

It is uncontroverted that Vesta failed to comply with the notice requirement of K.S.A. § 12–105b by filing a written notice as provided by the subsection prior to commencing its counterclaim. The question for the court is whether K.S.A. § 12–105b applies to Vesta's counterclaim in this instance. Vesta contends, for a variety of reasons, that it does not.

Vesta first contends that the Kansas notice statute does not apply to its counterclaim in this case because Oklahoma law governs Vesta's fraud counterclaim. The court agrees with Vesta that Oklahoma substantive law does apply to Vesta's fraud counterclaim. In a diversity action, this court applies the Kansas choice of law rule in determining which state's substantive law applies. *Dow Chemical Corp. v. Weevil–Cide Co., Inc.*, 630 F.Supp. 125 (D.Kan.1986). The rule in Kansas is that the law of the state where the tort occurred should apply. *See Ling v. Jan's Liquors*, 237 Kan. 629, 703 P.2d 731 (1985). A tort occurs in the state where the injury occurs, even if the tortious act occurred in another state. *Id.* In this case, the alleged fraudulent representation by Mr. Vannatta was made in a telephone call which Vesta received in Oklahoma. In applying the

Kansas choice of law rule, the law of the state in which a party receives the allegedly fraudulent misrepresentations will be applicable to the party's common law fraud claims. *See Antonson v. Robertson*, 141 F.R.D. 501 (D.Kan.1991).

■ Having determined that Oklahoma substantive law applies to Vesta's fraud counterclaim, however, does not end the inquiry as to whether K.S.A. § 12–105b applies. The question for the court is whether Oklahoma would recognize Kansas' notice requirement if a person brought a claim against a Kansas municipality for a tort occurring in Oklahoma.

In *Beard v. Viene*, 826 P.2d 990 (Okla. 1992), the Oklahoma Supreme Court was faced with the question of whether, as a matter of comity, Oklahoma would recognize Missouri's recovery limit on municipal tort liability. *Beard* involved a traffic accident that occurred in Oklahoma. Plaintiffs were injured when their vehicle was struck by a vehicle driven by Donna Viene who, in the course of her employment, was driving a vehicle owned by the City of Kansas City, Missouri. Defendant City of Kansas City, Missouri sought a partial summary judgment asserting that (1) the state of Missouri adheres to the doctrine of governmental tort immunity; (2) by the terms of Mo.Rev.Stat. § 537.600(1), the immunity of the political subdivisions of the State of Missouri is waived, except to the extent provided for in Mo.Rev.Stat. § 537.600(1), which limits recovery for tort liability arising out of a single transaction involving the negligent operation of a motor vehicle by an employee in the course of their employment, to the statutory maximum of $100,000.00 per person; (3) Oklahoma's Governmental Tort Claims Act contains a similar limitation on the tort liability of its political subdivisions; and (4) because the state of Oklahoma recognizes a limitation on municipal tort liability and inasmuch as Kansas City is a defendant in an adjudicative proceeding in the State of Oklahoma, the principle of comity dictates that Oklahoma recognize the limitation on the municipal tort liability by precluding recovery in excess of Missouri's statutory maximum. *Id.* at 992.

The Oklahoma Supreme Court held that under the principle of comity, Oklahoma would recognize the recovery limit on the municipal tort liability of the State of Missouri, affording deferential respect to the applicable Missouri statutes. *Id.* at 998. In reaching this conclusion, the court noted the deeply rooted history of the doctrine of sovereign immunity in the Anglo–American legal tradition. The court stated that while there was nothing in the statutory language to indicate that Oklahoma intended to apply extraterritorially the Governmental Tort Claims Act, there is an obvious intent to limit recoverability for the torts of the state and its political subdivisions. The court stated that "[w]hether claims be prosecuted in the courts of Oklahoma or in those of a sister state, Oklahoma's interest, as embodied in the Act, lies in limiting recoverability to the statutorily specified maximum." *Id.* at 997. The court concluded that "[g]iven this express statement of policy, a rule which extends to the State of Missouri the benefit of her own recovery limit not only fosters cooperation and promotes harmony between our two states, but also may be seen as a measure to effectuate the intent of the Oklahoma legislature in promulgating the Governmental Tort Claims Act." *Id.*

Just as Oklahoma's Governmental Tort Claims Act contained a liability limitation nearly identical to that of Missouri in the *Beard* case, Oklahoma's Governmental Tort Claims Act contains a notice provision nearly identical to that of Kansas. Ok.Stat. tit. 51 § 156 requires claims against a political subdivision be in writing and filed with the clerk of the governing body. The required contents of the written notice under Ok.Stat. tit. 51 § 156(E) are substantially similar to those required by K.S.A. § 12–105b(d). Additionally, Ok.Stat. tit. 51 § 157 provides that a claim is deemed denied if the political subdivision fails to approve the claim in its entirety within ninety (90) days. K.S.A. § 12–105b has an identical provision, the only difference being the municipality is given 120 days to approve the claim. Similarly, both the Oklahoma and Kansas notice statutes provide that no action may be maintained unless valid notice has been given and the action is

commenced within a certain period of time following denial of the claim (180 days for Oklahoma, 120 days for Kansas). Because Oklahoma's Governmental Tort Claims Act contains a notice provision substantially identical to that of Kansas, the court finds that based on the Oklahoma Supreme Court's holding in *Beard,* Oklahoma would recognize K.S.A. § 12–105b under the principles of comity.

██ Vesta next argues that even if K.S.A. § 12–105b would be recognized under Oklahoma law, the statute is inapplicable to Vesta's counterclaim in this action for a variety of reasons. Vesta first argues that KMGA is not a municipality within the meaning of K.S.A. 12–105b as defined by K.S.A. 12–105a(a). K.S.A. 12–105a(a) provides:

"Municipality" means and includes county, township, city, school district of whatever name or nature, community junior college, municipal university, drainage district, cemetery district, fire district, and other political subdivision or taxing unit, and including their boards, bureaus, commissions, committees and other agencies, such as, but not limited to, library board, park board, recreation commission, hospital board of trustees having power to create indebtedness and make payment of the same independently of the parent unit.

KMGA is an interlocal cooperation agency formed under the provisions of the Kansas Interlocal Cooperation Act. K.S.A. § 12–2901 *et seq.* Pursuant to the Interlocal Cooperation Act, KMGA has been created as a separate legal entity, made up solely of municipalities. Because KMGA is merely an organization made up of several municipalities which are acting jointly pursuant to the Interlocal Cooperation Act, the court finds that KMGA falls under the "other agency" language contained in the definition of municipality under K.S.A. § 12–105a(a). KMGA therefore must be viewed with all of the privileges and immunities that are available to municipalities, including the ability to rely on K.S.A. § 12–105b.

Vesta next argues that K.S.A. § 12–105b does not apply in this instance because the statute applies only to a plaintiff who is initiating an action and not to a defendant bringing a counterclaim, as is the case here. Vesta argues that because it filed a compulsory counterclaim, it did not "initiate an action" against a municipality and therefore the statute should not apply.

██ The court finds that Vesta's argument ignores the plain language of the statute and the purpose underlying it. K.S.A. § 12–105b(d) provides that: "[a]ny person having a claim against a municipality which could give rise to an action brought under the Kansas tort claims act shall file a written notice as provided in this subsection before commencing such action." Vesta's fraud counterclaim is clearly a claim which "could give rise to an action brought under the Kansas tort claims act." It is uncontroverted that Vesta failed to provide notice as required by he statute. The court sees no reason for dispensing with the notice requirements merely because Vesta's claim arose as a counterclaim in the suit.[8] Vesta clearly could have initiated its fraud action as an independent tort against KMGA had KMGA's lawsuit not already been on file. Additionally, the purpose of K.S.A. § 12–105b is to afford the public entity the opportunity to investigate the claim, to assess its liability, to attain settlement, and to avoid costly litigation. *Unified School Dist. No. 457 v. Phifer,* 729 F.Supp. 1298, 1306 (D.Kan. 1990). Vesta argues that once a municipality has filed suit, the purposes behind the statute do not apply to counterclaims filed in the case. The court does not agree with this conclusion. By filing its fraud counterclaim, Vesta greatly expanded the case from KMGA's original breach of contract action. Had Vesta complied with the requirements of K.S.A. 12–105b prior to filing its counterclaim, it is possible that KMGA, after reviewing the circumstances relating to the fraud counterclaim, may have decided it had merit and attempted to settle it (and possibly the entire matter) rather than litigate it. It

---

**8.** In *Unified School Dist. No. 457 v. Phifer,* 729 F.Supp. 1298 (D.Kan.1990), Judge Crow of this court applied K.S.A. § 12–105b to a defendant's counterclaims.

cannot be assumed, as Vesta does, that KMGA would automatically deny the claim.

■ Vesta next contends that its filing of its counterclaim and KMGA's answer denying the counterclaim constituted substantial compliance with the statute. The court does not agree. Vesta cites no Kansas cases that have found the filing of a lawsuit or a counterclaim to constitute substantial compliance with the statue. Indeed, such a finding would completely emasculate the purpose behind the statute, which is to give municipalities an opportunity to avoid litigation. Decisions interpreting K.S.A. § 12–105b and its predecessors have been fairly strict in determining the minimum requirements for notice, despite language about substantial compliance. *See Tucking v. Board of Com'rs of Jefferson County*, 14 Kan.App.2d 442, 796 P.2d 1055 (1990) and cases cited therein.

■ Vesta's final argument is that K.S.A. § 12–105b is an affirmative defense that KMGA waived by failing to assert the defense in its reply to Vesta's counterclaim. The court finds this argument has no merit. Case law in Kansas is clear that compliance with K.S.A. § 12–105b is a condition precedent to a claim for relief. The burden is not on KMGA to plead the defense, but rather upon Vesta to comply with the notice requirements. *See Tucking*, 14 Kan.App.2d at 443–45, 796 P.2d 1057; *Kilpatrick Brothers Inc. v. Poynter*, 205 Kan. 787, 473 P.2d 33 (1970).

■ Because the court has found that the notice provisions of K.S.A. § 12–105b apply to Vesta's fraud counterclaim against KMGA and that Vesta has failed to comply with the notice requirements, summary judgment as to Vesta's counterclaim for fraud against KMGA shall be granted.

D. *Vesta's third-party claims against GasTrak*

Vesta's original third-party complaint alleged four claims against GasTrak. In its response to GasTrak's motion for summary judgment, Vesta acknowledged that it was abandoning its breach of contract and unjust enrichment claims. Accordingly, GasTrak is granted summary judgment on Vesta's

breach of contract and unjust enrichment claims, which comprise counts I, II and III of Vesta's third-party complaint. Vesta's remaining claim against GasTrak is for fraud, based on the same alleged misrepresentation which formed the basis for its fraud claim against KMGA.

■ To establish a fraud claim under Oklahoma law a plaintiff must show by clear and convincing evidence. that: (1) defendant made a false, material misrepresentation; (2) that defendant knew it was false when it was made; (3) that it was made with intent that plaintiff act on it; and (4) that plaintiff relied on such representation and suffered detriment. *See Citizens Bank & Trust Co. of Vivian, Louisiana v. Tomlin*, 852 P.2d 803 (Okla.App.1993); *Silver v. Slusher*, 770 P.2d 878, 881 (Okla.1988). Vesta contends that Mr. Vannatta falsely represented that KMGA had a firm offer to supply natural gas at a price lower than Vesta had bid when in fact Mr. Vannatta knew this was not true. Vesta then contends that it relied on this false statement in lowering its bid to the amount that was eventually accepted by KMGA and incorporated into the letter agreements.

While denying that Mr. Vannatta ever made the statement relied on by Vesta in support of its fraud claim, GasTrak contends that even if such a statement was made by Mr. Vannatta GasTrak is entitled to summary judgment because such a statement would constitute mere "sales talk" or "puffing" and not actionable. fraud.

In *Beavers v. Lamplighters Realty, Inc.*, 556 P.2d 1328 (Okla.Ct.App.1976), the Oklahoma Court of Appeals addressed this question. In *Beavers*, the plaintiff was induced to pay $37,250 for a house based on the defendant/realtor's representation that there was another buyer for the house who was willing to pay $37,000. *Id.* at 1330. The realtor contended that the misrepresentations about another buyer were not actionable because his statement was mere puffing and commonly made by property sellers in order to enhance a property's value. *Id.* at 1331. The court rejected that argument, stating:

'[S]tatements by a vendor that a third person has offered him a certain sum for the property is a statement of material fact affecting the value and may form the basis for an action of deceit.' Such a statement . . . is more than mere puffing or so-called 'trade talk.' It is a motivational fact-related lie.

*Id.* at 1331 (quoting *Chisum v. Huggins,* 154 P. 1146 (Okla.1916)).

The court finds that Vesta has alleged that Mr. Vannatta made a specific deliberate statement regarding an offer KMGA had received for supplying gas, including price, when Mr. Vannatta was aware that no such firm offer existed. Based on the Oklahoma Appellate Court's holding in *Beavers,* this court finds that such a statement, if made, would constitute more than mere "puffing." The court finds that if a trier of fact were to believe the facts as alleged by Vesta, that would be sufficient for Vesta to state a claim for fraud. Therefore, Gas-Trak's motion for summary judgment as to Vesta's fraud claim will be denied.

### V. Conclusion

**IT IS, THEREFORE, BY THE COURT ORDERED THAT** the motion for summary judgment filed by third-party defendant GasTrak (Doc. # 45) is granted in part and denied in part. The motion is granted as to Vesta's claims against GasTrak for breach of contract and unjust enrichment. The motion is denied as to Vesta's fraud claim.

**IT IS FURTHER ORDERED THAT** defendant Vesta's motion for summary judgment against KMGA (Doc. # 47) is granted in part and denied in part. The motion is granted as to KMGA's fraud claim. The motion is denied as to KMGA's other claims.

**IT IS FURTHER ORDERED THAT** plaintiff KMGA's motion for summary judgment (Doc. # 53) is granted in part and denied in part. The motion is granted as to Vesta's counterclaim for fraud. The motion is denied as to all other claims.

**IT IS SO ORDERED.**